IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| School Express, Inc., | : | |
| Appellant | : | |
| | : | No. 711 C.D. 2021 |
| v. | : | |
| | : | Argued: December 12, 2022 |
| Upper Adams School District | : | |

BEFORE:
        HONORABLE PATRICIA A. McCULLOUGH, Judge
        HONORABLE MICHAEL H. WOJCIK, Judge
        HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## *OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                     FILED: January 9, 2023

School Express, Inc. (SEI) appeals from the June 7, 2021 Order of the Court of Common Pleas of Adams County (trial court) granting Upper Adams School District's (School District) motion for judgment on the pleadings. Upon review, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

On or about June 20, 2017, SEI and the School District entered into a contract for the provision of transportation for school students (Transportation Agreement). (Reproduced Record (R.R.) at 72a-79a.) The School District contractually guaranteed that SEI would be assigned no less than 50% of the students who are to be provided "non-traditional and/or non-school bus transportation each academic year" for the calendar school years of 2017-2018, 2018-2019, 2019-2020, 2020-2021 and 2021-2022. *Id*. at 72a. Paragraph 4(1) of the Transportation Agreement

stated "[t]he [School District] will pay [SEI] according to the daily scheduled route as prepared by [SEI] when any schools on the daily scheduled route operate." *Id*. Paragraph 4(3) provided that SEI would provide transportation on "regular school days in each school term for schools served as indicated on the respective school calendars." *Id*. Pursuant to Paragraph 4(4) of the Transportation Agreement, SEI was to be compensated on a per mile rate with a monthly fuel adjustment rate being assessed also on a per mile basis. *Id*. Paragraph 4(5) stated that monthly billing procedures include a fuel payment and that "[t]he contracted mileage rate and fuel adjustment rate included payment for fuel used by the contracted vehicles which provide transportation services as described in this contract." *Id*. at 74a. The terms of the Transportation Agreement also provided other incidental fee structures that increased over defined periods of time. In this regard, Paragraph 4(6) relating to layover rates, provided that the School District would pay a rate "per half-hour in excess of one half-hour of layover time." *Id*. Paragraph 4(7), relating to van assistants, stated that van assistants would be paid an "hourly rate." *Id*.

The Transportation Agreement obligated the School District to make timely payments within 30 days of the receipt of any invoice. *Id*. at 74a. The School District further was to provide SEI with rosters of students who required transportation "no later than the second week of the new academic year." *Id*. at 76a. The list of students (Student Transportation Lists) permitted SEI to budget mileage and fuel costs. *See* Complaint, ¶8.

On March 6, 2020, Governor Wolf issued a Proclamation of Disaster Emergency proclaiming the existence of a disaster emergency as it related to COVID-19 throughout the Commonwealth. (R.R. at 147a-49a.) On March 13, 2020, Governor Wolf ordered the closing of all schools throughout the Commonwealth for a period of 10 business days. During this period, continuity of education was not permitted. All

schools, statewide, were closed during this period. In a March 19, 2020 Executive Order, Governor Wolf ordered "all non-life sustaining business" closed with an enforcement date to occur on March 21, 2020 at 12:01 a.m. *Id*. at 151a-52a.

Following the closure of all non-life sustaining businesses, on March 23, 2020, Governor Wolf issued an Executive Order mandating "individuals to stay at home," whereby residents of certain counties were ordered to stay at home "[e]xcept as needed to access, support, or provide life sustaining business, emergency or government services." (Stay at Home Order). *Id*. at 154a-55a.

On March 27, 2020, Act 13[1] was signed into law, which amended the Public School Code of 1949, Act of March 10, 1949, P.L. 30 (School Code), as amended, to authorize the Pennsylvania Secretary of Education to permit and order the closure of all school entities until the threat to the health and safety caused by the COVID-19 pandemic had ended.

In Section 1501.8(*l*) of the School Code, 24 P.S. §15-1501.8(*l*),[2] the legislature provided school districts with the ability to renegotiate their contracts with the districts' various contractors in an effort to help mitigate the contractors' losses. Section 1501.8(*l*)(a) and (b) provides in this regard as follows:

> (1) Each school entity **may** renegotiate a contract for school bus transportation services to ensure contracted personnel and fixed costs, including administrative and equipment, are maintained during the period of school closure. During the period of school closure, the school bus transportation contractor shall submit weekly documentation to the school entity that its complement levels remain at or above the level on March 13, 2020, in order to continue being paid.

---

[1] Act of March 27, 2020, P.L. 62, No. 13.
[2] Section 1501.8 was added by Act 13.

3

(2) Notwithstanding any other provision of this act, **if** a school entity continues to pay a school bus transportation contractor or operates its own school bus transportation, the school entity shall be eligible for reimbursement from the Department of Education at a rate the school entity would have received had the pandemic of 2020 not occurred, had the minimum instruction days requirement not been waived under subsection (b)(1) or had the Secretary of Education not taken action under subsection (b)(2).

24 P.S. §15-1501.8(*l*)(a) and (b) (emphasis added).

On April 1, 2020, Governor Wolf amended the Stay at Home Order to include Adams County, and ordered Adams County residents to stay at home except as needed to access support or to be life sustaining, emergency or government services. Continuity of live and in-person education at school facilities was not deemed to be a life sustaining business.

On April 9, 2020, the Pennsylvania Secretary of Education issued an Executive Order pursuant to Act 13, which, *inter alia*, closed all in-person instruction at all Pennsylvania schools for the remainder of the 2019-2020 academic year. (R.R. at 145a.)

As a result of the Executive Orders, the School District moved to full remote instruction following the 10-day business closure mandated by Governor Wolf. Full remote instruction continued through the end of the 2019-2020 academic year. The School District did not pay SEI for days in which schools were not open or in session because SEI's vehicles were not in service, no miles were driven, no fuel was consumed and no School District students were transported from March 13, 2010, through the end of the academic year.

During this period, SEI made several demands for payment of invoices from March 13, 2020, through the end of the 2019-2020 academic year. (R.R. at 80a.) In addition to demands for compensation, SEI also made demands for Student

4

Transportation Lists for those students that would be transported by SEI during the 2020-2021 academic year. According to the Transportation Agreement, those lists were due "no later than the second week of the new academic year." *Id*. at 76a.

SEI commenced the instant lawsuit on September 11, 2020, asserting one count of breach of contract. *Id*. at 85a, 104a-05a, 107a-08a. In Paragraph 8 of the Complaint, SEI averred that "in order to fulfill its contractual obligations, SEI is required to expend significant fixed costs including the maintenance of insurance, its vehicles and employees." *Id*. at 86a. In Paragraph 18, SEI alleged that it did not terminate its employees in response to the COVID-19 pandemic. *Id*. at 87a. In Paragraph 35, SEI alleged that it "fulfilled and performed its obligations" under the Transportation Agreement. *Id*. at 89a. SEI averred that it invoiced the School District a total of $159,555.49 for March, April, May and June 2020 and attached an invoice as an exhibit.[3] *Id*. at 87a, 102a. SEI averred that the School District refused to pay any amounts due and owing to SEI, beginning with those amounts invoiced March 16, 2020. *Id*. at 87a.

SEI further alleged that, based on the course of dealings between the parties, the School District would provide the Student Transportation Lists prior to July 1st of each year. *Id*. at 88a. SEI alleged that because the School District did not provide the lists for the 2020-2021 school year prior to July 1, the School District breached the contract. *Id*. at 89a-90a.

The School District filed an answer with new matter on or about November 2, 2020, denying the averments of the complaint and attaching as exhibits Governor Wolf's Disaster Proclamation, the March 13, 2020 Executive Order, the March 19, 2020 Executive Order, the March 23, 2020 Stay at Home Order, the April

_____

[3] The invoice attached to the complaint did not contain a breakdown of the charges, miles traveled, or fuel consumed, but rather listed the total monthly amounts past due. (R.R. at 102a.)

5

1, 2020 Stay at Home Order, and the Secretary of Education's April 9, 2020 Executive Order. The School District asserted that under the Transportation Agreement, in order for SEI to be compensated, SEI must actually drive its service vehicles and provide services to the School District and its students. It maintained that due to the COVID-19 pandemic and government orders, schools were closed from March 16, 2020 through the end of the 2019-2020 academic year, and SEI rendered no services to the School District during that period. In its new matter, the School District specifically pleaded at Paragraphs 61, 63, 71, and 73 that the School District's buildings were closed, no one was physically present at the buildings, and no students were being transported. *Id*. at 131a-32a. The School District also raised affirmative defenses based upon the plain/clear meaning rule,[4] impossibility of performance, frustration of purpose, and prevention by governmental regulation or order. *Id*. at 111a. The School District asserted that the COVID-19 pandemic negated the need for transportation services. *Id*. The School District maintained it was under no obligation to provide Student Transportation Lists until after the start of the new academic year, which is on August 26, 2020. It attached as an exhibit a copy of the School District's 2020-2021 school calendars. *Id*. at 121a, 165a-76a.

SEI replied with its answer to new matter on or about November 20, 2020. SEI did not deny that the School District was closed to all live, in-person instruction at School District facilities from March 13, 2020, through the end of the 2019-2020 academic year by function of various Executive Orders by the Wolf Administration. Rather, it responded that the allegations were "conclusions of law to which no response was required." *Id*. at 201a-05a. Following the close of pleadings, the School District filed a motion for judgment on the pleadings on February 17, 2021. *Id*. at 2a.

---

[4] The School District raised this defense as to the meaning of "regular school days" and "academic year" as used in the Transportation Agreement.

6

On June 7, 2021, the trial court issued an Order and Opinion granting the School District's motion based on its conclusion that there was no genuine issue of fact concerning the breach of contract claim. The trial court held that the plain and unambiguous language of the Transportation Agreement did not impose upon the School District a duty to make payments when school was not operating. The trial court recapped the Governor's and Secretary of Education's proclamations and Executive Orders as they related to school closures. (Trial court op., 6/7/21 at 2.) The trial court ruled that under its plain meaning, the term "regular school days" did not include those days when school was held remotely due to the COVID-19 pandemic and the Wolf Administration's Executive Orders. *Id*. at 6. The trial court concluded that the Transportation Agreement only required compensation on days when students were actually transported to school by SEI. *Id*. The trial court found that, at no fault of the School District, students and teachers were excluded from the school building until a time which was then uncertain; thus, there was no place to which SEI could have transported students as contemplated by the Transportation Agreement. *Id*. The trial court further found that under the unambiguous terms of the Transportation Agreement, SEI was only to receive compensation for its services on a per mile rate with monthly fuel adjustment rates as assessed on a per mile basis. *Id*. The trial court found that the Transportation Agreement did not include a flat service fee, nor did it include language establishing payment if SEI was on standby. *Id*. The trial court further found that the Transportation Agreement did not include any payment scheme pertaining to maintenance and upkeep of the vehicles. *Id*.

The trial court held, alternatively, that even if the contract had been breached, the COVID-19 pandemic made performance impractical and impossible, the purpose of the contract was frustrated, and the Executive Orders excused performance.

7

With respect to SEI's assertion that the School District breached the contract by failing to provide Student Transportation Lists on or before July 1, 2020, the trial court agreed with the School District's assertion that the academic year began on the first day of school. The trial court found that the plain language of paragraph 6 of the Transportation Agreement was not ambiguous as to when the Student Transportation Lists must be provided to SEI. The trial court held that the relevant portion of the contract states the School District "will provide [its] respective student transportation lists to [SEI] no later than the second week of the new academic year." The trial court took judicial notice that the Board of School Directors determines and adopts the academic calendar from one year to the next, and that in this case, the first day of the new academic year was August 26, 2020. The trial court held that per the agreement, the Student Transportation Lists did not need to be provided until September 9, 2020.

SEI now appeals.

## II. ISSUES

On appeal,[5] SEI argues that the trial court misconstrued the standard for judgment on the pleadings by accepting the School District's affirmative defenses and factual assertions and citing the COVID-19 pandemic as its primary reasoning because those facts were beyond those contained in the pleadings. It further asserts that judgment on the pleadings was improper because there are disputed issues of fact with respect to whether (1) the School District breached the Transportation Agreement by failing to pay the outstanding invoices; (2) the School District breached the

---

[5] This Court's scope of review on a grant of judgment on the pleadings is plenary. *North Sewickley Township v. LaValle*, 786 A.2d 325, 327 (Pa. Cmwlth. 2001). The Court may only make a determination of whether the trial court committed an error of law or abuse of discretion. *Kerr v. Borough of Union City*, 614 A.2d 338, 339 (Pa. Cmwlth. 1992).

8

Transportation Agreement by failing to provide SEI with Student Transportation Lists for the 2020-2021 academic year; (3) it was impossible for the School District to perform under the Transportation Agreement; (4) the purpose of the Transportation Agreement was frustrated; and (5) Governor Wolf's Executive Orders excused the School District from performing under the Transportation Agreement.

## III. DISCUSSION

### A. Standard of Review on Motion for Judgment on the Pleadings

The motion for judgment on the pleadings is one of several pretrial mechanisms to save the parties the expense of having to go to trial on the merits before examining the legal sufficiency of the case. *DiAndrea v. Reliance Savings & Loan Association*, 456 A.2d 1066, 1069 (Pa. Super. 1983) "A motion for judgment on the pleadings is in the nature of a demurrer in which all of the nonmovant's well-pleaded allegations are viewed as true, but only those facts specifically admitted by the nonmovant may be considered against him." *Kerr*, 614 A.2d at 339.

When considering the appropriateness of judgment on the pleadings, we are guided by the following principles summarized in *Del Quadro v. City of Philadelphia*, 437 A.2d 1262 (Pa. Super. 1981):

> It is fundamental that a judgment on the pleadings should not be entered where there are unknown or disputed issues of fact. . . . In conducting this inquiry, the court should confine its consideration to the pleadings and relevant documents. . . . Since a motion for judgment on the pleadings is not a motion for summary judgment, no affidavit or depositions may be considered, nor is any matter before the court except the pleadings.

*Id.* at 1263 (citations omitted).

The party moving for judgment on the pleadings "must admit the truth of all the allegations of his adversary and the untruth of any of his own allegations that have been denied by the opposing party." *Pfister v. City of Philadelphia*, 963 A.2d 593, 597 (Pa. Cmwlth. 2009). When considering a motion for judgment on the pleadings, the trial court must accept as true "all well pled statements of fact, admissions and any documents properly attached to the pleadings presented by the party against whom the motion is filed." *North Sewickley Township*, 786 A.2d at 327. For the court to sustain a grant of judgment on the pleadings, the moving party's right to succeed must be "certain" and the case "so free from doubt that trial would be a fruitless exercise." *Id*.

### 1.

In its first issue, SEI argues that the trial court misconstrued the standards and requirements for judgment on the pleadings. SEI argues that its complaint sufficiently set forth all material facts required to maintain a cause of action for breach of contract. It submits that because the complaint did not include any mention of the COVID-19 pandemic and resulting government orders, the trial court was required to ignore the assertions by the School District that the COVID-19 pandemic negated the need for SEI's services because they were beyond those contained in the pleadings. SEI contends that by considering that information, the trial court, in essence, prematurely ruled that the School District's affirmative defenses had merit. Citing *Goldman v. McShain*, 247 A.2d 455, 461 (Pa. 1968), SEI argues that this was error because where a defendant moves for judgment on the pleadings relying upon an affirmative defense, granting such a motion is not appropriate unless the plaintiff has failed to deny the allegations which raise the defense. SEI argues that because it "denied each and every defense raised" by the School District, the trial court should have denied the motion and allowed the parties to proceed to discovery to adequately

10

address the accuracy of all claims and defenses. (SEI's Br. at 5.) We find no merit in SEI's argument.

First, we disagree that, by considering the effects on the need for student transportation by the various executive orders of the Wolf Administration, the trial court erroneously considered facts outside of the pleadings.

Under Pennsylvania law, judicial notice is governed by Pennsylvania Rule of Evidence (Pa. R.E.) 201, which provides that a court may take judicial notice of "fact[s] that [are] not subject to reasonable dispute." Pa. R.E. 201(b). There are two types of such facts: (1) facts which are "generally known within the trial court's territorial jurisdiction"; and (2) facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Pa. R.E. 201(b)(1)-(2). The practice of judicial notice serves judicial economy by relieving litigants and courts of the obligation to adduce evidence regarding obvious facts. *Wells v. Pittsburgh Board of Public Education*, 374 A.2d 1009, 1011 (Pa. Cmwlth. 1977). "It should not, however, operate to deprive the opposing party of the opportunity to disprove a fact subject to reasonable dispute." *Id*. (citing *Appeal of Albert*, 92 A.2d 663, 666-67 (Pa. 1952)). In other words, "[d]isputed questions of fact are not within the domain of judicial notice." *HYK Construction Co., Inc. v. Smithfield Township*, 8 A.3d 1009, 1017 (Pa. Cmwlth. 2010) (citation omitted).

Here, the trial court judicially noticed the Governor's signing of Act 13 into law and the subsequent Executive Orders of the Governor and Secretary of Education. No amount of testimony could have proved these facts more nor could testimony have disproved them. The effects of those orders were not subject to reasonable dispute. All schools across Pennsylvania were closed from March 2020 to the end of the 2019-2020 academic year, so no students needed to be transported to

school during that period. The School District merely pointed out the obvious. The trial court was not required to view the complaint in a vacuum and accept SEI's assertion that it fully performed as required under the Transportation Agreement – even though, as a matter of common knowledge, no School District students were transported to school by SEI after March 13, 2020, because the schools along the daily scheduled route were not operating due to the government shutdown. *See Duzicky v. Pennsylvania Board of Probation & Parole*, 282 A.3d 389 (Pa. Cmwlth. 2022) (taking judicial notice of the historic and novel COVID-19 pandemic and the Governor's response thereto, as well as the effect the pandemic had on prison operations at both the county and state levels); *Wiley v. Pennsylvania Board of Probation & Parole*, 801 A.2d 644, 645 n.3 (Pa. Cmwlth. 2002) (court took judicial notice of the historic events of September 11, 2001, and the Governor's response thereto, citing *Fatemi v. Fatemi*, 537 A.2d 840 (Pa. Super. 1988) (matters of history, if sufficiently notorious to be subject to general knowledge, will be judicially noticed)); *In re Belemecich's Estate*, 192 A.2d 740 (Pa. 1963), *reversed on other grounds*, 375 U.S. 395 (1964) (taking judicial notice that a country is behind the Iron Curtain, and that citizens of that country do not have control of their property).[6]

---

[6] This is not a case as in *Wells*, where we deemed it inappropriate for a court to take judicial notice of the impossibility of operating a public school during a union-sanctioned strike. In *Wells*, teachers filed a breach of contract action against the school board, arguing that they were entitled to pay even though there was a teachers' strike because they were at all times ready, able and willing to work and would have done so but for the decision of the board to close down the entire school system. The trial court took judicial notice of the "fact" that the strike made it impossible to keep the school open. This Court held that this was error because "[a] factual matrix to determine whether the [b]oard was 'compelled' to close the schools [had to] first be established." 374 A.2d at 1012. Here, unlike in *Wells*, it was indisputable that the School District's facilities were closed and inaccessible for traditional live instruction and it was impossible for the School District to provide students for transport by SEI under the constraints of the executive orders.

Further, SEI argues that the trial court erroneously relied on the School District's affirmative defenses in granting the motion for judgment on the pleadings. Contrary to SEI's contention, the trial court did no such thing. Rather, it assessed the averments of the complaint, construed the Transportation Agreement, concluded that it was unambiguous and then, after exercising judicial notice that was entirely warranted, determined that the School District did not, as a matter of law, breach the Transportation Agreement.[7] After concluding that there was no genuine issue of material fact concerning the breach of contract claim, the trial court then noted that "**even if** the contract had been breached, the COVID-19 pandemic made performance impractical and impossible, the purpose of the contract was frustrated, and Executive Orders excused performance." (Trial ct. order, 6/7/21 at 9-10) (emphasis added).

---

[7] SEI's reliance on *Goldman* is also misplaced. *Goldman* held that a complaint may state a claim upon which relief may be granted even though an affirmative defense exists. "[T]o say that a possible affirmative defense exists to a complaint is not to say that such a complaint is legally insufficient on its face." *Goldman*, 247 A.2d at 461. The court stated "[t]hus, a defendant may not rely on his affirmative defense to sustain a motion for judgment on the pleadings, **unless of course plaintiff has failed to deny the allegation in defendant's new matter which raises the defense**." *Id*. (emphasis added). Averments in a pleading to which a responsive pleading is required are admitted when not denied specifically or by necessary implication. Pennsylvania Rule of Civil Procedure (Pa.R.Civ.P.) 1029. The reply must include specific denial of factual allegations. *Cercone v. Cercone*, 386 A.2d 1, 5 (Pa. Super. 1978). Here, SEI failed to specifically deny the factual allegations in the School District's new matter, stating only that they were "legal conclusions to which no responsive pleading is required." In Paragraphs 61 and 62, the School District averred that it was "closed to all live, in-person instruction at District facilities from March 13, 2020 through the end of the 2019-2020 academic year by function of various executive orders from the Wolf Administration" and that "as a result, students, faculty, staff and administrative personnel were not present in the physical locations of District buildings." (R.R. at 131a.) These are not legal conclusions. They are factual averments, which are undeniable. In Paragraphs 63, 64, 71 and 72, the School District alleged that it was physically closed by operation of Executive Order, and transportation was not only not needed but impossible to be provided under the then current state of the Commonwealth due to the COVID-19 Pandemic. These are not legal conclusions either, but factual assertions. Because SEI failed to specifically deny these factual allegations, the rule in *Goldman* does not apply. *See Wimbish v. School District of School Hills*, 430 A.2d 710, 712 (Pa. Cmwlth. 1981).

13

Thus, we reject SEI's first argument that the trial court misapplied the standard for judgment on the pleadings by considering facts outside of the complaint.

**2.**

In its second issue, SEI argues that the trial court erroneously granted judgment on the pleadings because a disputed issue of fact exists with respect to the School District's breach of the Transportation Agreement. SEI argues that because the parties have different understandings of the meaning of "regular school days" discovery was necessary to aid in the trial court's interpretation. (SEI's Reply Br. at 2.)

The material facts for a breach of contract claim are (1) there was a valid contract between the parties; (2) the defendant breached the contract; and (3) the plaintiff suffered damages as a result of defendant's breach. *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010).

It is axiomatic in Pennsylvania that questions related to interpretation of a contract are questions of law for the Court, and not questions of fact. *Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1259 (Pa. 2015); *Codding v. Wood*, 3 A. 455, 457 (Pa. 1886). A determination as to whether a contract's terms are ambiguous is a matter of law for the court. *Starling v. Lake Meade Property Owners Association*, 162 A.3d 327, 346 (Pa. 2017).

"A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Insurance Adjustment Bureau v. Allstate*, 905 A.2d 462, 468–69 (Pa. 2006). The "reasonably" qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable. *Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2009).

"It is [also] well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Wert*, 124 A.3d at 1259.

> [W]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence. Hence, where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended.

*Id.*

As such, a determination by the court on a motion for judgment on the pleadings is proper in cases that turn upon the construction of a written contract. *DiAndrea v. Reliance Savings & Loan Association*, 456 A.2d 1066, 1071 (Pa. Super. 1983) (holding the trial judge was at liberty to decide the determinative question of contract interpretation when granting a motion for judgment on the pleadings).

In *Kroiz v. Blumenfeld*, 323 A.2d 339 (Pa. Super. 1974), Kroiz was a subcontractor of the appellants, and agreed to install hardwood floors at the appellants' apartment complex. Kroiz, pursuant to a clause in the subcontract, agreed to be liable for materials furnished in connection with the work it performed. *Id.* at 340. Subsequently, Cromer Corporation, a supplier of materials to Kroiz, sued the main contractor, who joined Kroiz, for the price of goods it had supplied. *Id.* By letter, Kroiz and Cromar agreed that the main contractor would pay Kroiz the amount of money due it, under the subcontract, reserving in escrow $7,000 to pay any judgment entered against the main contractor as a result of the existing litigation with the

15

supplier. Subsequently, a jury returned a verdict in favor of Cromar against Kroiz in the amount of $6,736.55. *Id.* Kroiz thereafter demanded payment of the $7,000.00 held in escrow. *Id.* Cromar refused, arguing that the escrow agreement was intended to withhold sufficient funds from Kroiz for the payment of any and all judgments entered against the main contractor by the supplier. *Id.* at 340-41. Cromar contended that the money should not be released from escrow until the outcome of a second suit filed by the supplier against the main contractor for goods it ordered from the supplier.

Affirming judgment on the pleadings, the Superior Court found Cromar had not pleaded any facts in support of its interpretation of the scope of the escrow agreement, that the escrow agreement constituted the full understanding of the parties, and that the terms of the escrow agreement clearly and unambiguously applied only to the first litigation by the supplier.

In the present matter, SEI maintained that "regular school day" was clearly defined within the Transportation Agreement as days which are "indicated by the school calendar." It argued that the Transportation Agreement required the School District to pay SEI on every day of the school calendar regardless of whether students were actually transported to school. It maintained that the School District was required to "continue to pay upkeep costs" because at "any given point, SEI could have been called to return to providing transportation services, [and] needed to be prepared for such an eventuality." (SEI's Reply Br. at 3.)

As in *Kroiz*, the trial judge rejected SEI's proffered interpretation and found instead that the School District was only obligated to pay SEI for miles traveled and fuel consumed by SEI vehicles on regular school days. The trial court concluded that because school was conducted remotely and students, faculty and staff were not exempt from the Governor's Stay at Home Order, the remaining school days for the

16

2019-2020 academic year were not "regular school days" which would require transportation of students under the terms of the Transportation Agreement. This interpretation was derived from the clear language of the Transportation Agreement. We find no error in it.[8]

Furthermore, the trial court did not err with respect to SEI's claims regarding the School District's failure to timely provide SEI with Student Transportation Lists.

Damages are an essential element of a breach of contract claim. *Sullivan v. Chartwell Investment Partners*, 873 A.2d 710, 716 (Pa. Super. 2005). Here, the complaint did not allege how SEI was damaged by the School District's failure to proffer its Student Transportation Lists on or before July 1, 2020.

As such, SEI failed to set forth a claim upon which relief can be afforded, and the grant of judgment on the pleadings was appropriate.

## IV.   CONCLUSION

Given our disposition of the first two issues, we need not address SEI's remaining three arguments that judgment on the pleadings was erroneous because there are disputed issues of fact with respect to the School District's affirmative defenses asserting that the COVID-19 pandemic and the resulting government orders: (1) made

---

[8] Contrary to SEI's assertion, it is not enough that the parties merely proffer different interpretations. Those interpretations have to be reasonable. *Trizechahn*, 976 A.2d at 483. Clearly, the trial court found SEI's interpretation of the Transportation Agreement unreasonable. We cannot conclude that this was error. SEI points to no language in the Transportation Agreement whatsoever that supports its assertion that the School District was obligated to pay it on days it did not transport students. As the trial court concluded, the Transportation Agreement contained no language that would support the conclusion that it was a flat fee service contract and did not include any contingencies in the event of school closures.

performance impossible or impractical; (2) frustrated the purpose of the Transportation Agreement; and (3) prevented performance by the School District.[9]

The obvious purpose of an affirmative defense is to provide an excuse or justification for non-performance. The School District's affirmative defenses offered excuses or legal justification in the event the trial court found it had breached the Transportation Agreement. Because we have already determined that there was no breach of contract based upon the plain contractual language of the Transportation Agreement, it is unnecessary to reach the questions of whether there are outstanding issues of fact with respect to the School District's affirmative defenses.

The order of the trial court is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge

---

[9] In those remaining issues, SEI argues that there are outstanding issues of fact with respect to the School District's affirmative defenses of impossibility, frustration of purpose, and excuse of performance because the General Assembly provided funding for the maintenance of school transportation contracts during the COVID-19 pandemic. SEI contends that performance under the contract was not impossible, frustrated or excused because the School District **could have** continued issuing payment to SEI if it had simply obtained those funds. However, this assertion goes to the underlying merits of the School District's affirmative defenses, not to whether the School District breached the Transportation Agreement, and we need not address it. We only note for purposes of clarity and completeness that nothing in section 1501.8(*1*) of the School Code, 24 P.S. §15-1501.8(*l*), mandated school districts to renegotiate their contracts with bus transportation companies. Rather, the plain language of the statute states that school districts "may" renegotiate a contract for school bus transportation services to ensure contracted personnel and fixed costs, including administrative personnel and equipment, are maintained during the period of school closure, and that "if" they did so, they would be reimbursed by the Department of Education.

18

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

School Express, Inc.,           :
          Appellant      :
                      :   No.  711 C.D. 2021
        v.             :
                      :
Upper Adams School District   :

## ***ORDER***

AND NOW, this 9th day of January, 2023, the June 7, 2021 Order of the Court of Common Pleas of Adams County is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge